**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

*Attorneys for Plaintiff Giuseppe Rabasca*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GIUSEPPE RABASCA, Derivatively on Behalf of Nominal Defendant C3.AI, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS M. SIEBEL, PATRICIA A. HOUSE, CONDOLEEZZA RICE, RICHARD C. LEVIN, MICHAEL G. MCCAFFERY, S. SHANKAR SASTRY, BRUCE SEWELL, LISA A. DAVIS, JIM H. SNABE, AND STEPHEN M. WARD, JR.,<br><br>Defendants,<br><br>and<br><br>C3.AI, INC.,<br><br>Nominal Defendant. | Case No. 3:23-1566<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Giuseppe Rabasca ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant C3.ai, Inc. ("C3" or the "Company") against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding C3, the securities class action *The Reckstin Family Trust v. C3.ai, Inc.*, No. 4:22-cv-01413 (N.D. Cal.) (the "Securities Class Action"), news reports, securities analysts' reports about the Company, and other publicly available information.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought on behalf of C3 against certain officers and members of the Company's Board for breaches of their fiduciary duties and violation of federal law as set forth below.

2. According to its public filings, C3 delivers a family of fully integrated products including the C3 AI Platform, an end-to-end platform for developing, deploying, and operating enterprise AI applications; C3 AI applications, a portfolio of industry-specific software-as-a-service ("SaaS") enterprise AI applications that enable the digital transformation of organizations globally; and C3 Generative AI, a suite of large AI transformer models for the enterprise.

3. As alleged herein, the Registration Statement filed in connection with C3's initial public offering conducted on December 9, 2020 (the "IPO" or "Offering") represented that C3 had access to and was leveraging the extensive marketing, sales, and services resources of oil and gas monolith Baker Hughes Company ("Baker Hughes"), including Baker Hughes' "12,000-person sales organization." The Registration Statement also stated that Baker Hughes had already brought in deals generating revenue for C3. These representations allowed the Company to go

Case 4:23-cv-01566-HSG   Document 1   Filed 04/03/23   Page 3 of 20

public, raising over $610 million in proceeds in the IPO.

4. However, the Registration Statement failed to disclose that C3 did not have access to, and was not able to utilize, the 12,000-person salesforce, but instead set up a separate sales division that relied on salespeople that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce.

5. Moreover, contrary to the representations in the Registration Statement, at the time of the IPO, Baker Hughes had brought in no deals through its reseller agreement with C3, so it was impossible for C3 to have recognized revenue through the arrangement.

6. Last, after the IPO, Defendants continued to falsely tout the Company's access to and use of Baker Hughes' full 12,000-person salesforce, while also concealing a massive reorganization of C3's own salesforce that had begun at least by July 2021. These post-IPO representations and omissions further inflated the price of C3's Class A common stock until the Company's lack of access to Baker Hughes' true salesforce and the undisclosed risks posed by C3's ultimately massive salesforce reorganization materialized when C3 would go on to report decreasing key financial metrics, massive insider selling, and ultimately the truth, thereby causing the stock price to plummet.

7. As a result of the foregoing, the Securities Class Action was filed against the Company, certain of its directors and officers, Baker Hughes Company, and the underwriters in the IPO, exposing the Company to massive class-wide liability.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 3 -

11. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

*Plaintiff*

13. Plaintiff is, and has been at all relevant times, a shareholder of C3.

*Nominal Defendant*

14. Nominal Defendant C3 is a Delaware corporation with its principal executive offices located at 1300 Seaport Boulevard, Suite 500, Redwood City, California 94063. C3's common stock trades on the NYSE under the ticker symbol "AI."

*Individual Defendants*

15. Defendant Thomas M. Siebel ("Siebel") is Founder, Chief Executive Officer ("CEO"), and Chairman of the Board of the Company.

16. Defendant Patricia A. House ("House") is a member of the Board of the Company and a member of the Compensation Committee.

17. Defendant Condoleezza Rice ("Rice") is a member of the Board of the Company.

18. Defendant Richard C. Levin ("Levin") is a member of the Board of the Company and a member of the Audit Committee.

19. Defendant Michael G. McCaffery ("McCaffery") is a member of the Board of the Company, Chairperson of the Audit Committee, and a member of the Nominating and Corporate Governance Committee.

20. Defendant S. Shankar Sastry ("Sastry") is a member of the Board of the Company.

21. Defendant Bruce Sewell ("Sewell") is a member of the Board of the Company, Chairperson of the Nominating and Corporate Governance Committee, and a member of the

Compensation Committee.

22. Defendant Lisa A. Davis ("Davis") is a member of the Board of the Company and a member of the Audit Committee.

23. Defendant Jim H. Snabe ("Snabe") is a member of the Board of the Company.

24. Defendant Stephen M. Ward, Jr. ("Ward") is a member of the Board of the Company, Chairperson of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee.

25. Defendants referenced in paragraphs 15 through 24 are herein referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26. By reason of their positions as officers and/or directors of C3, and because of their ability to control the business and corporate affairs of C3, the Individual Defendants owed C3 and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage C3 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of C3 and its shareholders.

27. Each director and officer of the Company owes to C3 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

28. The Individual Defendants, because of their positions of control and authority as directors and/or officers of C3, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29. To discharge their duties, the officers and directors of C3 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

30. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of C3, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32. To discharge their duties, the officers and directors of C3 were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of C3 were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to C3's own Code of Conduct and Business Ethics;

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how C3 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

    (iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of C3 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    (v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that C3's operations would comply with all applicable laws and C3's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

    (vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

    (vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

    (viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

33. Each of the Individual Defendants further owed to C3 and the shareholders the duty of loyalty requiring that each favor C3's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34. At all times relevant hereto, the Individual Defendants were the agents of each other and of C3 and were at all times acting within the course and scope of such agency.

35. Because of their advisory, executive, managerial, and directorial positions with C3, each of the Individual Defendants had access to adverse, non-public information about the Company.

36. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by C3.

## C3'S CODE OF BUSINESS CONDUCT AND ETHICS

37. C3's Code of Business Conduct and Ethics provides:

C3.ai, Inc. ("C3 AI") is committed to conducting its affairs honestly and ethically. We expect every employee, officer and director to act with integrity, apply good judgment and observe the highest personal ethical standards in making business decisions.

* * *

Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 AI policies relating to legal compliance, including C3 AI's Anti-Corruption Policy and Insider Trading Policy. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as C3 AI, to civil and/or criminal penalties, and may be grounds for disciplinary action, up to and including termination of employment.

38. The Code of Business Conduct and Ethics continues:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. If you have any concerns about how to comply with this policy, or if you observe conduct or actions that do not seem to comply with this policy, you should immediately discuss such concerns with the General Counsel.

**SUBSTANTIVE ALLEGATIONS**

39. According to its public filings, C3 delivers a family of fully integrated products including the C3 AI Platform, an end-to-end platform for developing, deploying, and operating enterprise AI applications; C3 AI applications, a portfolio of industry-specific SaaS enterprise AI applications that enable the digital transformation of organizations globally; and C3 Generative AI, a suite of large AI transformer models for the enterprise.

40. The Company primarily derives revenues from subscriptions of software, which account for 86% of revenues. Term subscriptions of the C3 AI Suite and Applications are usually for a period of three years. Besides deriving subscription revenues, the Company also generates revenues from professional services, which primarily consists of fees related to the implementation of services for new customer deployments of its applications. Professional services are provided both onsite and remotely, and include training, application design, project management, system design, data modelling, data integration, application design, development support, data science, and C3 AI Suite administration support.

41. C3's fees depend on the level of effort required for specific tasks and are generally a fixed-fee arrangement and recognized as its services are performed. Generally, the Company's professional services revenues have lower margins than subscription revenues.

42. Because C3 generates most of its revenue through multi-year contracts, an important metric for evaluating the Company's financial performance is "Remaining Performance Obligation" or "RPO." RPO represents the total future obligations remaining under contracts. For example, if a C3 client had a contract under which it was required to pay $10 million per year for three years, and had already paid $5 million, its RPO would be $25 million. C3 reports both RPO under generally accepted accounting principles ("GAAP"), which only includes non-cancellable contracts, and Adjusted RPO, which includes cancellable contracts.

43. As of the time of the IPO, C3 was not a profitable company. Instead, it presented itself as a fast-growing company that was building up a large client base of corporate clients. Key to this effort was sales. Under normal circumstances, a major constraint to sales growth would be the size of C3's salesforce, which numbered approximately 700. But C3 claimed it also utilized a

much larger salesforce – that of its partner companies, particularly its most significant partner, Baker Hughes. This was especially important for C3 because, as the Company disclosed in its Registration Statement, their products require lengthy and resource-intensive sales cycles.

44. In June 2019, Baker Hughes entered a deal with C3 whereby Baker Hughes purchased a subscription of C3's suite of AI software for their own operations, the exclusive right to resell C3 offerings in the oil and gas industry, and a non-exclusive right to sell in other industries (the "Joint Venture"). Baker Hughes also agreed to a total revenue commitment to C3 of $50.0 million, $100.0 million, and $170.0 million, for fiscal years ending April 30, 2020, 2021, and 2022, respectively, inclusive of their subscription fees of $39.5 million. In June 2020, they revised the agreement to extend the term by an additional two years, to a total of five years, and modified Baker Hughes' commitments to $53.3 million, $75.0 million, $125.0 million, and $150.0 million for the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively, and reducing their subscription fees to $27.2 million. If Baker Hughes failed to generate enough sales to meet the revenue commitments, it was required to pay the difference. If they exceeded the commitment, C3 would pay it a sales commission.

45. At the same time, Baker Hughes purchased 9,529,762 shares of Class B common stock and 1,283,333 shares of Series G convertible preferred stock at a purchase price of $4.62 per share and $19.8252 per share, respectively. As a result of this purchase, Baker Hughes' CEO Lorenzo Simonelli ("Simonelli") was appointed to the Board of C3.

46. Prior to the IPO and at the time the Registration Statement became effective, Baker Hughes owned 14.76% of C3's Class A common stock. Immediately after the sale of additional shares to the public in the IPO, Baker Hughes owned 11.65% of the Class A common stock or 10,813,095 shares.

47. However, the Baker Hughes partnership was not as publicly represented. As Siebel admitted on December 1, 2021, in an earnings call, rather than rely on their main salesforce and existing business units, Baker Hughes "formed a new business unit that was called Baker Hughes C3Ai that sat outside of [the Baker Hughes sales] organization[]. And so they really weren't the people with the relationships, and they weren't the people with the quotas, and they weren't the

people with the deep industry expertise."

48. On December 17, 2021, Baker Hughes' CEO Simonelli resigned from the C3 Board.

49. Defendants made false and misleading statements and failed to disclose material facts in the Registration Statement regarding the size and experience of the Baker Hughes salesforce.

50. On November 13, 2020, C3 filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 8, 2020.

51. On December 9, 2020, pursuant to the Registration Statement, C3's Class A common stock began publicly trading on the NYSE under the trading symbol "AI." That same day, C3 filed the prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

52. Pursuant to the Registration Statement, C3 issued 15.5 million shares of its Class A common stock to the public at the Offering price of $42.00 per share for approximate proceeds to the Company of $610 million after applicable underwriting discounts and commissions.

53. The Registration Statement made the following statements that would be misleading to a reasonable investor.

54. In describing the "Go-to-Market Strategy," the Registration Statement stated, in relevant part:

> Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. ***Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes***, as well as with our iconic global customers, some of whom are deploying C3 technology to optimize thousands of critical assets

globally across their upstream, midstream, and downstream operations.

(Emphasis added.)

55. In describing "Sales Alliances," the Registration Statement stated, in relevant part:

*Baker Hughes: Oil, Gas, and Chemicals*. In 2019, we a formed a strategic alliance with Baker Hughes, a $24 billion oil and gas services company. Under the terms of this alliance, Baker Hughes has standardized on C3.ai for all internal use AI applications. ***In addition, we are jointly marketing and selling a range of Enterprise AI solutions to address the entire value of upstream, mid-stream, and downstream activity under the BHC3 brand to oil and gas companies globally with the active engagement of Baker Hughes, which has a 12,000-person sales organization.***

(Emphasis added.)

56. The foregoing statement was misleading for failing to disclose the fact that C3 did not have engagement with the Baker Hughes 12,000-person salesforce, but instead set up a separate sales division that relied on a subset of sales people that did not have the industry connections, expertise, support, or mandatory sales quotas of Baker Hughes' typical salesforce, and that as a result, C3 could not reap the full benefits of a partnership.

57. In describing factors affecting the Company's performance, the Registration Statement stated, in relevant part:

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization. During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement.

(Emphasis added.)

58. The foregoing statement was misleading for stating that C3 recognized revenue from deals brought in by Baker Hughes through the reseller arrangement in the fiscal year ending

April 30, because Baker Hughes had, in fact, brought in no deals through the reseller agreement, so it was impossible for C3 to have recognized revenue through the arrangement for fiscal year ending April 30.

59. As a result of the foregoing, the Securities Class Action was filed against the Company, exposing C3 to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

61. C3 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

62. Plaintiff is a current shareholder of C3 and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

63. A pre-suit demand on the Board of C3 is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Siebel, House, Rice, Levin, McCaffery, Sastry, Sewell, Davis, Snabe, and Ward.

64. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the current directors of C3 are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

65. The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

66. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

67. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

68. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

69. Accordingly, a pre-suit demand on the Board is futile and excused.

**COUNT I**
**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

70. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

71. The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73. The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

74. The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of C3 were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

75. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of C3, their control over, and/or receipt and/or modification of C3's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning C3, participated in the fraudulent scheme alleged herein.

76. As a result of the foregoing, the market price of C3 common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, plaintiff relied on the statements described above and/or the integrity of the market price of C3 common stock in purchasing C3 common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

77. In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

### COUNT II
### Against the Individual Defendants for Breach of Fiduciary Duty

78. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79. The Individual Defendants owed the Company fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

80. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

81. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

82. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

83. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

### COUNT III
**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

84. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

86. Plaintiff on behalf of C3 has no adequate remedy at law.

## COUNT IV
**Against the Individual Defendants for Unjust Enrichment**

87. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, C3.

89. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from C3 that was tied to the performance or artificially inflated valuation of C3, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

90. Plaintiff, as a shareholder and a representative of C3, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

91. Plaintiff on behalf of C3 has no adequate remedy at law.

## COUNT V
**Against the Individual Defendants for Waste of Corporate Assets**

92. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

94. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

95. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

96. Plaintiff on behalf C3 has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: April 3, 2023                    **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By, *Rachele R. Byrd*
RACHELE R. BYRD

BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
FERDEZA ZEKIRI (335507)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com
zekiri@whafh.com

**RIGRODSKY LAW, P.A.**
TIMOTHY J. MACFALL
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
tjm@rl-legal.com

**GRABAR LAW OFFICES**
JOSHUA H. GRABAR
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff Giuseppe Rabasca*

29310v2

## VERIFICATION

I, Giuseppe Rabasca, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/29/2023

*Giuseppe Rabasca*
DocuSigned by: 0652D0DDA17149B...
Giuseppe Rabasca